UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ROBERT WAYNE SHAFER,

                Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

                Defendant.

) 1:07-CV-01284-LJO-SMS
)
)
) FINDINGS AND RECOMMENDATION RE:
) PLAINTIFF'S SOCIAL SECURITY
) COMPLAINT (DOC. 2)
)
)
)
)
)
)
)
)
)

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying an application for benefits. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C.§ 636(b) and Local Rule 72-302(c)(15). The matter is currently before the Court on the parties' briefs, which have been submitted without oral argument to the Honorable Sandra M. Snyder, United States Magistrate Judge.

I. Procedural History

With a protective filing date of July 8, 2005, Plaintiff

applied for Disability Insurance Benefits (DIB), alleging

disability due to anxiety, depression, arthritis, and neck pain

since January 25, 2005. (A.R. 13, 61-63, 16, 94.) After

Plaintiff's claim was denied initially and on reconsideration,

Plaintiff requested and appeared at a hearing before the

Honorable James P. Berry, Administrative Law Judge (ALJ) of the

Social Security Administration (SSA), on April 4, 2007;

Plaintiff, who was represented by an attorney, testified. (A.R.

13, 35, 38, 13, 305-29.) On May 9, 2007, the ALJ denied

Plaintiff's application for benefits. (Id. at 13-19.) Plaintiff

sought review from the Appeals Council. After the Appeals Council

denied Plaintiff's request for review on July 30, 2007, Plaintiff

filed the complaint in this action on September 5, 2007. (Id. at

4-6.) Briefing commenced on June 30, 2008, and was completed on

July 23, 2008.

   II. Scope and Standard of Review

   Congress has provided a limited scope of judicial review of

the Commissioner's decision to deny benefits under the Act. In

reviewing findings of fact with respect to such determinations,

the Court must determine whether the decision of the Commissioner

is supported by substantial evidence. 42 U.S.C. § 405(g).

Substantial evidence means "more than a mere scintilla,"

Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a

preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10

(9th Cir. 1975). It is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion."

Richardson, 402 U.S. at 401. The Court must consider the record

as a whole, weighing both the evidence that supports and the

2

evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

III. Disability

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which

has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that the claimant is not only unable to do the claimant's previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520 (1997);[1] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in

---

[1] All references are to the 2007 version of the Code of Federal Regulations unless otherwise noted.

4

severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

Here, the ALJ found that Plaintiff's severe impairments of major depressive disorder and panic disorder did not meet or medically equal a listed impairment; Plaintiff retained the residual functional capacity (RFC) to perform heavy exertional work with specifically stated nonexertional limitations of simple and repetitive tasks; maintain attention, concentration, persistence, and pace; relate to and interact with others; adapt to usual changes in the work setting; and adhere to safety rules. (A.R. 15-16.) Plaintiff thus could perform his past relevant work (PRW) as a baker's helper and sanitation cleaner. (A.R. 18.) Therefore, Plaintiff was not disabled from January 25, 2005, through May 9, 2007, the date of decision. (A.R. 19.)

IV. Credibility Findings

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably have been expected to produce the alleged symptoms, but Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. (A.R. 16.)

Plaintiff argues that the ALJ's findings did not clarify to

5

what extent Plaintiff's statements were credible, and the weight

to which they were entitled; further, some of the reasons stated

(activities of daily living, and the finding that Plaintiff did

not require any special accommodations to relieve his symptoms)

were the product of the ALJ's failure to consider and analyze the

effect of the structured environment which protected Plaintiff

from "exacerbations caused by experiences outside of the

environment." (Brief. p. 10.) The remaining reasons, which were

not identified in the brief, were "not relevant to plaintiff's

mental limitations." (Id.)

The court in Orn v. Astrue, 495 F.3d 625, 635 (9th Cir.

2007), summarized the pertinent standards for evaluating the

sufficiency of an ALJ's reasoning in rejecting a claimant's

subjective complaints:

> An ALJ is not "required to believe every
> allegation of disabling pain" or other non-exertional
> impairment. See Fair v. Bowen, 885 F.2d 597, 603 (9th
> Cir.1989). However, to discredit a claimant's testimony
> when a medical impairment has been established, the ALJ
> must provide "'specific, cogent reasons for the
> disbelief.' " Morgan, 169 F.3d at 599 (quoting Lester,
> 81 F.3d at 834). The ALJ must "cit[e] the reasons why
> the [claimant's] testimony is unpersuasive." Id. Where,
> as here, the ALJ did not find "affirmative evidence"
> that the claimant was a malingerer, those "reasons for
> rejecting the claimant's testimony must be clear and
> convincing." Id.
>
> Social Security Administration rulings specify the
> proper bases for rejection of a claimant's testimony.
> See S.S.R. 02-1p (Cum. Ed.2002), available at Policy
> Interpretation Ruling Titles II and XVI: Evaluation of
> Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R.
> 96-7p (Cum. Ed.1996), available at 61 Fed.Reg.
> 34,483-01 (July 2, 1996). An ALJ's decision to reject a
> claimant's testimony cannot be supported by reasons
> that do not comport with the agency's rules. See 67
> Fed.Reg. at 57860 ("Although Social Security Rulings do
> not have the same force and effect as the statute or
> regulations, they are binding on all components of the
> Social Security Administration, ... and are to be
> relied upon as precedents in adjudicating cases."); see

> Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998)
> (concluding that ALJ's decision at step three of the
> disability determination was contrary to agency
> regulations and rulings and therefore warranted
> remand). Factors that an ALJ may consider in weighing a
> claimant's credibility include reputation for
> truthfulness, inconsistencies in testimony or between
> testimony and conduct, daily activities, and
> "unexplained, or inadequately explained, failure to
> seek treatment or follow a prescribed course of
> treatment." Fair, 885 F.2d at 603; see also Thomas, 278
> F.3d at 958-59.

The factors to be considered in weighing credibility are set forth in the regulations and pertinent Social Security rulings. They include the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the person receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used to relieve the symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529; S.S.R. 96-7p.

With respect to the course of analysis directed by the regulations, the ALJ is first obligated to consider all symptoms and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. § 404.1529(a). Once it is determined that there is a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must then evaluate the intensity and persistence of the

symptoms to determine how the symptoms limit the capacity for work. § 404.1529(b), (c). The ALJ will consider all available evidence. To the extent that the claimant's symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, the symptoms will be determined to diminish the claimant's capacity for basic work activities. § 404.1529(c)(4). A claimant's statements will not be rejected solely because unsubstantiated by the available objective medical evidence. § 404.1529(c)(2).

Further, the relevant Social Security Ruling provides in pertinent part that an ALJ has an obligation to articulate the reasons supporting the analysis:

> ...When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.
>
> The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

S.S.R. 96-7p at 4.

Plaintiff testified at the hearing that he stopped working

8

because of his anxiety, panic attacks, and depression. (A.R. 309-313.) He had problems concentrating and paying attention at the time of the hearing. (Id. at 314-15.) He had a bad neck and low back; he had gone to pain management, but they cancelled because Plaintiff was supposed to have an MRI before going there. (A.R. 316.) Plaintiff said that his back, hips, and legs all the way to his feet hurt and went numb; he had aches in his shoulders and neck for which he probably took three to four extra strength Tylenol tablets during the day for the pain. (Id.) He vacuumed once in a while, and he had performed yard work (cleaning, raking, mowing, and blowing things down) in place of the regular gardener the other day for about six hours, which started bothering his back and neck, and he could not handle the work. (A.R. 319.)

Here, the ALJ stated that he had considered all symptoms and the extent to which they could be considered consistent with the objective medical evidence. (A.R. 16.)

Earlier in his decision the ALJ noted that Plaintiff's complaints of neck pain were inconsistent with the objective medical evidence, which included an internist's examination in 2005 which did not reveal any significant, abnormal clinical findings, establish a severe cervical spine disorder, or reveal any severe physical impairment. (A.R. 15.) This finding is supported by substantial evidence in the form of Dr. Stoltz's report of his examination of September 2005 that produced essentially normal findings and revealed no evidence of any ongoing medical disorders that would limit Plaintiff's activities. (A.R. 184-88, 186-88.) It is also consistent with a

later x-ray of the cervical spine taken in August 2006 that revealed neural foraminal narrowing on the right at the C5-6 level and disc space narrowing at C5-6 with anterior osteophytes, the extent of which was not specified and which was thus subject to the ALJ's authority to reconcile conflicting medical evidence. (A.R. 293.) To the extent that evidence is inconsistent, conflicting, or ambiguous, it is the responsibility of the ALJ to resolve any conflicts and ambiguity. Morgan v. Commissioner, 169 F.3d 595, 603 (9th Cir. 1999). Because the ALJ has authority to interpret ambiguous medical opinions, Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993), the Court must defer to the ALJ's decision.

The ALJ also concluded that Plaintiff's complaints of arthritis in the right shoulder were inconsistent with an x-ray taken in August 2006 that showed no signs of impingement and no degenerative changes. (A.R. 16, 292.)

Finally, the ALJ had noted that although an x-ray of the lumbar spine showed degenerative changes at L4-S1, there was no clinical correlation. (A.R. 16.) Substantial evidence supported this finding in that the x-ray of August 2006 revealed degenerative changes with disc space narrowing at the L4-S1 level with osteophytes arising off L3, L4, and L5. However, in contrast, Plaintiff testified that he could lift thirty-five pounds and fifteen pounds frequently, could stand four to five hours with breaks, had no problems sitting, and took only Tylenol to help cope with the pain. (A.R. 294, 316-18.) The ALJ further noted that Plaintiff had no ongoing or regular treatment for his allegedly severe physical complaints. (A.R. 15.)

The ALJ specifically stated that the weight of the objective medical evidence did not support the claims of Plaintiff's disabling limitations to the degree alleged. (A.R. 17.) He further noted that in contrast to the Plaintiff's allegations of disabling pain, Plaintiff did not exhibit any significant atrophy, loss of strength, or difficulty moving that were indicative of severe and disabling pain. (A.R. 17.) Substantial evidence in the form of Dr. Stoltz's report from his consultative examination supports this finding. (A.R. 185-88.)

Likewise, reliance on the conservative nature of treatment or a lack of treatment is appropriate in rejecting a claimant's subjective complaint of pain. Johnson v. Shalala 60 F.3d 1428, 1433-34 (9th Cir. 1995). Here, Plaintiff does not argue that there is any lack of substantial evidence supporting the ALJ's conclusion that Plaintiff's treatment was generally conservative in approach and that Plaintiff had not generally received the type of medical treatment one would expect for a totally disabled individual. (A.R. 17.) Medication and massage for Plaintiff's physical complaints, and even the counseling and out-patient therapy for Plaintiff's mental impairments, which were the treatments received by Plaintiff, constitute conservative measures.

Given the extent of Plaintiff's claims of disability, the Court finds that these reasons were clear and convincing in force.

A related reason stated by the ALJ that is likewise clear and convincing in the circumstances of this case is that Plaintiff's medications were relatively successful in treating

his problems and did not produce side-effects. (A.R. 17.) The ALJ stated:

> Although the claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in his favor, the objective medical evidence shows that the medications have been relatively effective in controlling the claimant's symptoms. Moreover, the claimant has not alleged nor is there evidence of any side effects from the use of medications (e.g. Exhibits 9F/3, 13, 29; and 11F/7).

(A.R. 17.)

Again, Plaintiff does not challenge this reasoning. The record reflects that Plaintiff's treating sources, Marta Obler, M.D., Staff Psychiatrist at Kaiser Permanente, and Elaine Schomaker, LCSW, LMFT, opined in March 2007 that Plaintiff's medication was well tolerated and had permitted Plaintiff to function in a structured environment. (A.R. 302.) Plaintiff reported to his treating sources in July and November 2006 and in January 2007 that he suffered no side-effects from the medications that he was taking, which at various times included Metrogel, Tetracycline, Buspirone, Lisinopril, Prazodone, Paroxetine HCL, Proair HFA, Clonazepam, Hydrochlorothiazide, and Atenolol. (A.R. 239, 249, 265.) The Court further notes that Plaintiff himself testified that he did not have any side-effects from the medicine that he took during the day; he sometimes wished that the medicines were a little bit stronger, but his doctor did not want to do that to him. (A.R. 315.) The record thus contains substantial evidence supporting the ALJ's finding concerning the effectiveness of medications and lack of side-effects.

Plaintiff does not argue that these findings or reasons were

unsupported by substantial evidence or were defective for any
reason other than that they were not relevant to Plaintiff's
mental limitations. (Brief. pp. 9-10.) The Court rejects
Plaintiff's argument that these findings are insufficient because
they pertain to physical, as distinct from mental, limitations.
This is because in the present case, Plaintiff had subjective
complaints based not only on his mental impairments, but also on
his physical pain and claimed physical limitations. It is
established that although the inconsistency of objective findings
with subjective claims may not be the sole reason for rejecting
subjective complaints of pain, Light v. Chater, 119 F.3d 789, 792
(9th Cir. 1997), it is one factor which may be considered with
others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004);
Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999). Here,
the lack of objective medical evidence to support Plaintiff's
subjective complaints related to physical limitations is a
pertinent, persuasive, and clear and convincing reason for
rejecting Plaintiff's subjective complaints and for making
findings concerning Plaintiff's credibility.

One of the two reasons given by the ALJ for discounting
Plaintiff's credibility that Plaintiff does challenge is the
ALJ's reliance on Plaintiff's daily activities. The ALJ stated:

> The statement of activities of daily life are
> (sic) not consistent with his alleged state of
> debilitation. He does some household chores. He
> drives to eat out, visit friends, and attend
> church. He goes to men's ministry prayer meetings.

(A.R. 17.) Plaintiff does not challenge the sufficiency of the
evidence to support this finding, but rather contends that these
particular daily activities do not warrant an adverse credibility

determination because they do not contradict other testimony, and the ALJ made no findings regarding the transferability of the daily activities.

The pertinent legal standards are established. A claimant's ability to engage in activities of daily living to the extent that he or she spends a substantial part of the day engaged in pursuits involving the performance of physical functions that are transferable to the work setting is relevant; a specific finding as to this fact may be sufficient to discredit a claimant's allegations. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). Likewise, it has been held that evidence of ability to maintain concentration consisting of a claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for a friend's child, was inconsistent with a clamant's claim of concentration difficulties. Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999).

Included in the factors that an ALJ may consider in weighing a claimant's credibility are the claimant's reputation for truthfulness; inconsistencies either in the claimant's testimony or between the claimant's testimony and the claimant's conduct, daily activities, or work record; and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable or not. Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999).

Here, the ALJ did expressly state that Plaintiff's claims of

inability to work because of extreme mental impairment were inconsistent with his activities of daily living. (A.R. 17.) Thus, the ALJ was relying on an inconsistency. The record reflects the inconsistency to which the ALJ referred. Plaintiff testified that he had to stop working because he was anxious, depressed, and suicidal; his panic attacks prevented him from remembering what he was supposed to do to follow assignments. (A.R. 309.) Further, at the time of the hearing, he testified that he had daily panic attacks lasting from two to fifteen minutes which left him crying and needing to lie down, which he would do for three or four to six hours; this happened on an average of once a day. (A.R. 312, 314, 319.)

However, Plaintiff also testified to, and reported on, a wide range of tasks in which he engaged. He ran the vacuum cleaner for his wife, and he did yard work, including a recent job of six or so hours of cleaning, raking, mowing, and blowing stuff, but he took a lot of breaks. (A.R. 319.)

Plaintiff's wife's function report of August 2005 was consistent with Plaintiff's testimony as to his activities; she noted how Plaintiff drove with family or friends, shopped for a couple of hours once or twice a week, and mowed the lawn every week and a half for ninety minutes or longer, but he needed to be reminded to do it when the yard looked bad. (A.R. 71, 73.) He visited family or talked on the telephone a few times every week, attended church twice weekly, and attended some ball games at Grizzly Stadium. (A.R. 75.) She said he had no problems getting along with people who were not troublemakers, and he did not like to be alone for very long or he would have panic attacks and

depression. (A.R. 76.) Sometimes he would not finish something he started, but sometimes he would; spoken instructions needed to be repeated several times. (Id.)

Plaintiff's function report was likewise consistent; he stated he went out monthly to help feed and clothe the homeless with a group of church people (A.R. 80.) Plaintiff testified that his medications had to be adjusted because some were incompatible with his hepatitis C. (A.R. 311.) He forgot things he was told. (A.R. 314.) However, he testified that he drove and in fact did most of the driving, which was to doctor's appointments and stores within six miles or so from his home. (A.R. 319.) He got out of the house that way on an average of three times a week in addition to attending church on Sunday. (A.R. 320.) He did not like being home or out by himself, and so he went to medical appointments and shopping with his wife. He talked to people at church weekly. (A.R. 314.) He watched TV, went out for dinner, went to the movies rarely, gathered with friends or family once a month, and recently had traveled to Disneyland and Universal Studios. (A.R. 322-23.) He attended the men's ministry at church, and he last attended it six months before the hearing. (A.R. 324.)

The extent to which Plaintiff's subjective claims were exaggerated was also specified. The ALJ indicated that Plaintiff's claims were not credible to establish a more restrictive residual functional capacity than the RFC the ALJ found, which was likewise specified as heavy exertional work with the following nonexertional limitations:

simple and repetitive tasks; maintain attention,

concentration, persistence and pace; relate to and
                    interact with others; adapt to usual changes in
                    work setting; and adhere to safety rules.

(A.R. 16.)

        The ALJ did not expressly state that the activities of daily

living in which Plaintiff engaged involved the use of skills that

were transferable to a work setting. However, Plaintiff cites no

authority for the proposition that such an express sub-finding is

necessary. It is necessary for an ALJ to make a credibility

determination and state reasons if it is determined that a

claimant's testimony relating to the intensity or extent of his

pain and limitations is unreliable. Morgan v. Commissioner, 169

F.3d 595, 599 (9th Cir. 1999). The precise extent of the

"specific findings" required with respect to activities of daily

living is not clear; however, an express finding that a claimant

spends a substantial part of the day engaged in pursuits

involving the performance of physical functions that are

transferable to a work setting is sufficient. Fair v. Bowen, 885

F.2d 597, 603-604 (9th Cir. 1989). Findings concerning

credibility matters must generally support the ultimate

conclusions made and must be sufficiently specific to permit one

who reviews that finding to conclude that the ALJ rejected the

testimony on permissible grounds and did not arbitrarily

discredit the claimant's testimony; the reviewer must not be left

to speculate as to the grounds for the conclusions. Thomas v.

Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (citing Bunnell v.

Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991). The specific

findings must relate to the claimant's daily activities. Bunnell

v. Sullivan, 947 F.2d 341, 346.

Here, the ALJ specified the tasks or types of tasks upon which the ALJ relied, including household chores, driving, visiting friends, and regularly attending church and ministry prayer meetings.

Plaintiff's ability to do household chores, including regularly performing heavy gardening for ninety minutes at a time, and occasionally performing such work for a six-hour period, provides strong support for the conclusion that Plaintiff could perform heavy exertional work. It was unnecessary for the ALJ to make a specific finding that heavy gardening for a specifically stated period of time involved skills transferable to the heavy exertional work that the ALJ concluded that Plaintiff could perform; the record is sufficiently clear as it stands to reflect that the ALJ so concluded and that such a conclusion was based on specific evidence in the record and was not arbitrary.

Plaintiff claimed that his non-exertional impairments were the reason why he had to stop work and could not return to work. He complained of anxiety, depression, disabling daily panic attacks with nausea and sweating, difficulty remembering things such as his work assignments and the need to put safety guards back on a machine, difficulty concentrating and paying attention, difficulty following written instructions, needing spoken instructions to be repeated, bouts of crying, difficulty in keeping it together, and inability to be alone. (A.R. 309-314, 318, 80, 83-84.) The ALJ's reliance on Plaintiff's driving, visiting friends, and regularly attending church and ministry prayer meetings was thus appropriate in the circumstances of this

case. These activities reflect substantial performance of tasks transferable to a work setting. Repeated attendance at church and prayer meetings without difficulty reflects significant ability to concentrate and maintain attention. Driving distances as long as six miles requires constant focus, concentration, and maintenance of attention; any failure could result in danger or damage to property or life. Further, it requires following and applying numerous complex rules of the road from a reservoir of knowledge that Plaintiff himself apparently retained and considered accessible. By its nature, driving often requires immediate reactions to unexpected phenomena such that there is no appreciable time to deliberate or seek advice or instruction from external sources. It was reasonable for the ALJ to infer from Plaintiff's regular and substantial driving without difficulty that he could maintain substantial attention, concentration, persistence and pace; perform simple, repetitive tasks; adapt to usual changes in the work setting; and adhere to safety rules.

The last aspect of the ALJ's credibility findings subject to challenge is the statement that the record did not show that Plaintiff required any special accommodations (e.g., special breaks or positions) to relieve his pain or other symptoms. (A.R. 17.) Plaintiff argues that the ALJ ignored and did not analyze the effect of the "structured environment" which "protects plaintiff from exacerbations caused by experiences outside of the environment." (Brief p. 10.) Plaintiff cites to a letter written jointly from his staff psychiatrist, Dr. Obler, and his therapist, Elaine Schomaker, dated March 20, 2007, directed to Plaintiff's counsel along with an assessment form that counsel in

turn had requested. (A.R. 302.) His treating sources state in the

letter that since Plaintiff's departure from work in January

2005, Plaintiff had been able to function based on his present

regimen of medication, which he had tolerated well. They

continued:

> However, Robert lives in a structured environment.
> His wife provides transportation and supervises his
> activities. Robert is very uncomfortable going anywhere
> alone. Outside of that environment, Robert becomes
> anxious, subject to panic attacks which result
> in deep depression accompanied by suicidal thoughts
> which he tries to challenge. At this time Robert is not
> capable of maintaining eight hours a day, five days
> a week, or an equivalent work schedule.

(A.R. 302.)

First, the ALJ referred to special accommodations and

specified special breaks or positions. (A.R. 17.) Thus, it is not

even clear that the ALJ was referring to Plaintiff's mental

impairments or limitations therefrom; rather, it appears that the

ALJ was referring to physical limitations of which Plaintiff

complained in relation to his arthritis and neck pain.

With respect to the asserted failure of the ALJ to consider

Plaintiff's "structured environment," it is clear from the ALJ's

opinion that he determined that Plaintiff drove to many places,

shopped, and maintained an active social life outside the home

environment that included frequently eating out, visiting

friends, attending church, and attending meetings. (A.R. 17.)

These activities occurred in an environment that was in many

respects outside of the scope of the control of Plaintiff's wife.

It is reasonably inferred that some if not many of Plaintiff's

daily activities outside the home involved unscripted and

unstructured interaction, the presence of strangers, a risk of

unexpected interruptions from various forces and actors, and many other phenomena that could not be said to be part of a "structured environment." Plaintiff claimed that he was anxious if he went somewhere alone; he did not say that he could not survive outside the presence of his wife or that he required her supervision or even her presence at every activity in which he engaged. As will be discussed below, the ALJ was fully familiar with the expert opinions and with Plaintiff's medical history. It does not appear from the record that the ALJ ignored either the history of Plaintiff's mental impairment or the claimed limitations therefrom; instead, it appears that the ALJ discredited Plaintiff's claims of disabling symptoms based on specific, substantial evidence in the record.

Accordingly, the Court concludes that although there might have been factors supporting Plaintiff's credibility, the ALJ cited clear and convincing reasons for rejecting Plaintiff's subjective complaints to the extent alleged, and the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony. Cf. Batson v. Commissioner of the Social Security Administration, 359 F.3d 1190, 1196 (9th Cir. 2004).

V. Expert Opinions

Plaintiff challenges the RFC assigned by the ALJ. Plaintiff argues that there is a lack of substantial evidence to support the ALJ's rejection of the opinion of Plaintiff's treating sources, Dr. Marta Obler, staff psychiatrist at Kaiser

Permanente, Fresno, and therapist Elaine Schomaker, LCSW, LMFT, rendered on or about March 20, 2007, part of which has been previously discussed. Plaintiff argues that the ALJ failed to assess the structured environment in which Plaintiff functioned, as his treating sources had done, and as regulations required. Further, Plaintiff contends that his treating sources' treatment records and medical assessments firmly supported the opinions of the treaters, and that the reasons given by the ALJ were legally insufficient.

The standards for evaluating treating source's opinions are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the

> opinion; and "[o]ther factors" such as the degree
> of understanding a physician has of the
> Administration's "disability programs and their
> evidentiary requirements" and the degree of his or
> her familiarity with other information in the case
> record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9ᵗʰ Cir. 2007).

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been recently restated:

> The opinions of treating doctors should be given more
> weight than the opinions of doctors who do not treat
> the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th
> Cir.1995) (as amended).] Where the treating doctor's
> opinion is not contradicted by another doctor, it may
> be rejected only for "clear and convincing" reasons
> supported by substantial evidence in the record. Id.
> (internal quotation marks omitted). Even if the
> treating doctor's opinion is contradicted by another
> doctor, the ALJ may not reject this opinion without
> providing "specific and legitimate reasons" supported
> by substantial evidence in the record. Id. at 830,
> quoting Murray v. Heckler, 722 F.2d 499, 502 (9th
> Cir.1983). This can be done by setting out a detailed
> and thorough summary of the facts and conflicting
> clinical evidence, stating his interpretation thereof,
> and making findings. Magallanes v. Bowen, 881 F.2d 747,
> 751 (9th Cir.1989).] The ALJ must do more than offer
> his conclusions. He must set forth his own
> interpretations and explain why they, rather than the
> doctors', are correct. Embrey v. Bowen, 849 F.2d 418,
> 421-22 (9th Cir.1988).
> Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998);
> accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at
> 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9ᵗʰ Cir. 2007).

The opinions of the treating sources are stated in a letter and on accompanying forms from the Social Security Disability Advocate's Handbook, dated March 22, 2007, which Obler and Schomaker apparently filled out at the request of Plaintiff's counsel.

In the letter, Dr. Obler and Schomaker stated that since stopping work in January 2005, Plaintiff had been able to

function based on his present regimen of medication, which he had tolerated well; however, he lived in a structured environment with his wife providing the transportation and supervising his activities. (A.R. 302.) Further, he was very uncomfortable going anywhere alone; outside of "that environment," he became anxious and was subject to panic attacks which resulted in deep depression accompanied by suicidal thoughts, which he in turn tried to challenge. The treating sources opined that Plaintiff was not capable of maintaining eight hours a day, five days a week, or an equivalent work schedule. (A.R. 302.) The diagnosis was major depression, recurrent; anxiety disorder, not otherwise specified; the prognosis was guarded, and the global assessment of functioning (GAF) ranged from moderate to mild dependent upon the stressors. (A.R. 302.)

In the two virtually identical, accompanying assessments signed by Obler and Schomaker on March 22, 2007, which were on check-off type forms, the treating sources opined that Plaintiff was markedly limited (i.e., the impairment precluded the person's ability to perform the designated activity on a regular and sustained basis of eight hours a day, five days a week, or an equivalent work schedule) in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of approximately two hours; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted by them; make simple, work-related decisions; complete

a normal workday and workweek without interruptions from
psychologically based symptoms and perform at a consistent pace
without an unreasonable number and length of rest periods;
interact appropriately with the general public; respond
appropriately to changes in the work setting; and travel in
unfamiliar places or use public transportation, or set realistic
goals or make plans independently of others. (A.R. 296-301.)

The treating sources opined that Plaintiff was moderately
limited (i.e., the impairment seriously interfered with the
person's ability to perform the designated activity on a regular
and sustained basis of eight hours a day, five days a week, or an
equivalent schedule) in the ability to remember locations and
work-like procedures; ask simple questions or request assistance;
accept instructions and to respond appropriately to criticism
from supervisors; and get along with coworkers or peers without
unduly distracting them or exhibiting behavioral extremes. (Id.)

They opined that Plaintiff was mildly limited (i.e. the
impairment mildly limited the person's ability to perform the
designated activity on a regular and sustained basis of eight
hours a day, five days a week, or an equivalent schedule) in the
ability to understand, remember, and carry out short and simple
instructions, and to maintain socially appropriate behavior and
to adhere to basic standards of neatness and cleanliness. (Id.)

Finally, they both opined that Plaintiff had the limitations
for twelve continuous months, or that the limitations could be
expected to last twelve continuous months at the assessed
severity. (A.R. 298, 301.) Although the form had a specific
question and space for an answer to be written in (as distinct

from a box for a check mark) concerning the date of onset, neither of the sources stated the date of onset. (Id.)

The ALJ noted that Plaintiff, who had major depressive disorder and panic disorder, had been treated with medication management, counseling, and therapy that had helped alleviate his symptoms; Plaintiff saw Obler at Kaiser every six to eight weeks to refill his prescription medication; his other visits at Kaiser were with his social worker, Schomaker. (A.R. 15.) The ALJ expressly stated that in making his finding as to Plaintiff's RFC, he considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence. (A.R. 16.)

In making his findings concerning the severity of Plaintiff's mental impairments, the ALJ relied on the fact that his GAF score improved from 41-50, which indicates serious symptoms, to moderate symptoms, and ultimately to 61-70, which reflects mild symptoms. (A.R. 15.)

The ALJ expressly addressed the opinion evidence, stating that he gave little weight, and not controlling weight, to the opinions of Obler and Schomaker of March 20, 2007. He noted that the degree of severity and extremity of the limitations were not supported by the progress notes or the mental status exams. (A.R. 17.) Further, the exams showed no significant cognitive deficits. (A.R. 17.) Finally, specified GAF scores undermined the opinions. (A.R. 17-18.)

Review of the progress notes reveals that Dr. Obler and Schomaker provided treatment to Plaintiff from early 2005 through early 2007, with Schomaker's seeing Plaintiff usually twice a

month and Dr. Obler's reviewing Plaintiff's condition and medications periodically but less frequently. (A.R. 132-79, 210-225, 237-286.) Early in 2005, Plaintiff reported depression and anxiety accompanied by frequent panic attacks. (A.R. 152-72.) Plaintiff was treated with medication and did admit some lessening of his symptoms. (A.R. 163, 159, 157-58, 151, 149.) Plaintiff's anxiety and suicidal thoughts appeared to increase in May and June 2005 when he thought of going back to work or visited his former job site. (A.R. 149, 147, 145-46.) He considered retirement instead, and in June 2005 he reported anxiety based on spending a day's researching of courthouse records to determine his four ex-spouses' respective entitlements to his retirement benefits. (A.R. 145-46.) He continued to suffer anxiety and panic attacks in the summer of 2005 from his financial situation, including his attempt to obtain long-term disability from the SSA; the death of his dog also spurred a round of great depression and suicidal thoughts. (A.R. 143-44, 141.) However, he reported reduced depression and better control of his suicidal thoughts by medication in July 2005 despite stress from the process of seeking Social Security benefits. (A.R. 141.)

Plaintiff suffered continued stress from having submitted his application to the SSA in August 2005; further, he was adamant that he could no longer work, frustrated at medication changes precipitated by the hepatitis C that he suffered, and was sad that he would never work again. (A.R. 134-40.) In September and October 2005 he reported a decrease in the severity of his anxiety and depression, less frequent panic attacks that

continued to be situational, and a feeling that his therapy sessions were helpful. (A.R. 133-34, 215-222.) His application for benefits was denied, and he contested that; he felt like he needed to have someone around him all the time, and his sessions continued to be helpful. (A.R. 213-14.) In November 2005, his panic attacks and depression occurred less frequently. (A.R. 211.)

In early 2006, Plaintiff's Social Security application was denied, and that caused him to be confused and upset; he had nausea, dizziness, light-headedness, and crying spells. (A.R. 285-86.) In February and March 2006, he suffered great financial distress, impaired concentration, and difficulty comprehending written text when his state disability benefits stopped after one year, and he was appealing his Social Security denial. (A.R. 279-84.) He reported that he remained depressed and suicidal, with accompanying bouts of throwing up. (A.R. 279.)

In April and May 2006, Plaintiff reported an elevated mood; a change in medication had resulted in improved mood and sleep and fewer crying spells. (A.R. 276-77.) Plaintiff admitted that he had a good day every once in a while. (A.R. 274.) However, he suffered chest pains, feared they indicated a heart attack, and was worried about his Social Security appeal. (A.R. 274.)

By June 2006, Plaintiff reported that his crying spells were less frequent, and there had been a slight improvement in symptoms over the past few weeks. (A.R. 271.) However, he was worried about his Social Security application's having been denied twice, and he reported that he was not driving anymore and was dependent upon his wife for transportation. (A.R. 271-72.) By

the later part of June, he was driving again, but he reported
that it was only for short distances. (A.R. 269-70.) Although he
was worried about his Social Security situation, he reported that
he was less depressed and anxious; there had been a slight
improvement in the past weeks, and he was able to attend more
public events and was getting out of the home more often. (A.R.
267-70.)

In July and August 2006, Plaintiff continued to report that
he was doing fine or a little better, experienced improved and
mild symptoms, and was trying to do more mentally. His bad dreams
and suicidal thoughts had stopped, his concentration had
improved, he slept well and had a good appetite, and he
experienced a <u>greatly</u> decreased incidence of depressed mood and
anxiety; he had good days, and the medications were helping.
(A.R. 255-64.) For example, Plaintiff reported on August 8, 2006,
that he had experienced the passing of another anniversary of the
date on which Plaintiff was involved in an automobile accident
that resulted in the loss of human life; the anniversary was not
as difficult as in other years. (A.R. 261.) Plaintiff reported on
August 22, 2006, that his depression and anxiety were minimal.
Although he had had a nightmare about his former bakery job, he
put the nightmare in perspective and was relaxed and joking when
discussing it. Plaintiff accepted his general mood and had been
practicing cognitive restructuring techniques with apparent
success. (A.R. 259-60.) Again, on September 12, 2006, Plaintiff
reported that he had good days with his mood being up and down;
however, there was nothing that he could not accept, and he was
able to challenge his anxiety by busying himself with watching

TV, listening to music, and controlling his breathing to reduce his stress. He reported that things had improved over the past few weeks, and he was almost getting used to it; his depression was greatly decreased, and on the scale (presumably a scale of one to ten), his depression was only a two or three. (A.R. 255.)

Plaintiff's reported improvement continued in October and November 2006. He reported fewer panic attacks and both good and bad days in early October at a time when he had attended two funerals in several weeks; he talked himself out of a lot of panic attacks, and he reported less anxiety when he was out with people despite a worsening of symptoms for a two-week period. (A.R. 253-54.) In later October, he reported that he just dealt with his anxiety when it came and tried to keep it controlled; further, he had started taking evening walks with the coming of the cooler weather. (A.R. 251-52.) In the middle of November he reported experiencing even less anxiety and depression. He just put his problems in prayer. He was not crying any more and exhibited an increased skill level in challenging his depression and anxiety; his symptoms had improved in the past couple of weeks. (A.R. 247-48.) He reported that he had attended a church-sponsored men's retreat over the weekend, which he found uplifting, renewing, and inspirational; he was becoming more involved in church activities in order to distract himself from his emotions. (A.R. 247-48.)

Plaintiff reported a return of his depression and a worsening of symptoms for two weeks in December 2006. (A.R. 246.)

However, in January 2007 he reported that his symptoms had been the same for the past few weeks; he had difficulty with

anxiety when he was out among people, but he was O.K. at home, so he could not take a job around people. (A.R. 243.) In later January, he reported that although his anxiety and depression were still there, he reported that he was coping better with his symptoms through cognitive restructuring on good and bad days. Plaintiff was walking more and sleeping well; his symptoms had remained the same over the past few weeks. (A.R. 241-42.) He again reported mild symptoms on January 25, 2007. (A.R. 239-40.) In February 2007, he reported that he thought that some of his anxiety was due to the fact that he was too idle; his symptoms (depression, anxiety, panic, lack of energy and concentration) were the same. (A.R. 237-38.)

From this summary of the progress notes, it becomes clear that although Plaintiff continued to experience some depression, anxiety, and panic attacks over the years, his symptoms lessened, and his skills and strategies for coping with his impairments increased. Although Plaintiff continued to struggle with a depressed mood and anxiety over his finances, Plaintiff admitted that he was gaining skills and was able to engage in more activities outside the home or in public. From the record it appears that he had made a significant adjustment to his circumstances. The progress notes thus do not reflect someone who suffered such severe symptoms of depression and anxiety that he could not engage in any work-related activities.

Further, the record likewise supports the ALJ's conclusion that the mental status exams did not substantiate the extreme limitations endorsed by Plaintiff's treating sources. (A.R. 17.) Despite some contrary reporting by Plaintiff that reflected

depressed or anxious mood, negative thoughts, and/or impaired concentration or insight, the mental status exams were generally within normal limits and reflected unimpaired capacities or appropriate reactions. (A.R. 170, 163, 159, 157-58, 155, 151, 147, 145, 143, 139, 137, 133, 221, 219, 215, 213, 211 [2005]; 281, 279, 276, 271, 267, 265, 263, 261, 259-60, 257, 255, 253, 251, 249, 247, 245 [2006]; 243, 241, 239, 237 [2007].) Further, the progress notes reflected frequent notations of mild signs or of improvement in symptoms or coping skills. (A.R. 163, 159, 154, 151, 149, 147, 141, 134, 221, 219, 215, 213, 211 [2005]; 276, 274, 271, 267, 265, 263, 261, 259, 257, 255, 253, 247 [2006]; 243, 241, 239, 237 [2007].) As the ALJ noted, the mental status exams do not show significant cognitive deficits; rather, the pertinent notations reflect only impaired concentration, occasionally impaired memory, and some negative self-talk or ruminating thoughts.

Further, as the ALJ noted, some of the GAF scores assigned to Plaintiff by Obler and Schomaker in 2006 and 2007 were from 61-70. A GAF, or global assessment of functioning, is a report of a clinician's judgment of the individual's overall level of functioning that is used to plan treatment and to measure the impact of treatment as well as to predict its outcome. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., text revision) (DSM-IV-TR). A GAF in the range of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

DSM-IV-TR at 34. A GAF within the range of 51 through 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. A GAF between 61 and 70 indicates a person with some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but who is generally functioning pretty well and has some meaningful interpersonal relationships. Id.

The ALJ relied on the GAF scores of 61-70, showing mild symptoms but pretty good functioning, that were assigned by Schomaker in August and November 2006 and January and February 2007. (A.R. 259-60, 247-48,239-40, 237-38.) Plaintiff argues that the ALJ impermissibly picked higher scores that were not representative of the entire range of scores.

Review of the GAF scores assigned from September 2005 through February 2007 reflects that of the approximately thirty scores given by Plaintiff's treating sources, ten were from 41-50, thirteen were from 51-60, and seven were from 61-70. However, a clear trend to the higher scores is apparent over the pertinent time period. In addition, the repeated scores of 61-70 reflected only mild symptoms, minimal difficulties but generally good functioning, and meaningful interpersonal relationships; these evaluations are inconsistent with the severe dysfunction that Plaintiff claimed would prevent him from ever going back to work. The Court concludes that the ALJ's reasoning in this regard was specific and legitimate.

The Court notes that the ALJ's reliance on the GAF scores of 61-70 given by Dr. Obler in July, August, and November 2006 was likewise supported by the record and was a legitimate basis for the conclusion regarding the experts' opinions. The scores themselves (A.R. 265-67, 257-58, 249-50) present the same inconsistency with the opinions concerning Plaintiff's capacity. Further, Dr. Obler's scores create an inconsistency with Schomaker's scores in that after Dr. Obler assessed Plaintiff with GAF scores of 61-70 in July and August 2006, Schomaker assessed scores of 51-60 within short time intervals thereafter even though Plaintiff had reported improvement after having been assessed by Dr. Obler. (A.R. 265-67, 263-64, 257-58, 255-56.)

It is established that the opinion of a treating physician may be rejected if it is ambiguous and inconsistent or conclusionary in form and not supported by clinical findings or relevant medical documentation. Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995). Further, a GAF evaluation may be considered in evaluating an impairment. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Here, the ALJ appropriately determined that the opinions of the treating sources were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with the other substantial evidence in the case record, including but not limited to the opinion of the consulting, examining psychiatrist, Dr. Ekram Michiel, M.D., who was board-certified in psychiatry. Upon examining Plaintiff in September 2005, Dr. Michiel found that Plaintiff had an

essentially normal mental status except for depressed mood and restricted, sad affect. Dr. Michiel diagnosed anxiety disorder, not otherwise specified; depressive disorder, not otherwise specified; and a GAF of 65. He concluded that Plaintiff could maintain attention and concentration and carry out one-step or two-step, simple job instructions; could relate and interact with coworkers, supervisors, and the general public; and was unable to carry out an extensive variety of technical and/or complex instructions. (A.R. 180-83.)

Reliance on the opinion of a consulting, examining physician is appropriate, and the opinion of such an expert is substantial evidence where it is based on the expert's own examination and clinical findings. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). Here, Dr. Michiel's opinion was expressly adopted by the ALJ, who concluded that it was based on the doctor's detailed clinical findings, and that it was substantiated by the findings documented in the progress notes of Dr. Obler and Ms. Schomaker. (A.R. 18.) Substantial evidence supported the ALJ's conclusion, and his reasoning was sufficiently specific and legitimate.

The ALJ also rejected Dr. Obler's opinion that Plaintiff was unable to work as conclusory and not entitled to controlling weight. (A.R. 18.) The ALJ correctly concluded that a medical source's opinion that a claimant is disabled is not entitled to controlling weight. The determination of whether or not a claimant meets the statutory definition of disability is a legal conclusion reserved to the Commissioner; the opinion of a medical source on the ultimate issue of disability is not conclusive. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); <u>Magallanes v. Bowen</u>, 881

F.2d 747, 751 (9th Cir. 1989).

Plaintiff argues that the ALJ failed to take into account the experts' opinion that it was the structured environment that permitted Plaintiff to achieve the relatively high degree of functioning attributed to him in the form of the higher GAF scores. Again, it was for the ALJ to evaluate the weight to be put on the opinions of the experts. As indicated hereinabove, the ALJ appropriately considered relevant factors and stated specific and legitimate reasons for adopting the opinion of the consulting examiner and for giving less weight to the treating sources' opinions.

VI. <u>Recommendations</u>

Accordingly, pursuant to the analysis set forth above, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, it IS RECOMMENDED that

1. Plaintiff's social security complaint BE DENIED; and

2. Judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Robert W. Shafer, BE ENTERED.

This report and recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document

should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    March 26, 2009**                    **/s/ Sandra M. Snyder**
                                          UNITED STATES MAGISTRATE JUDGE